UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KESHA LAVELLE TATE,

    Plaintiff,

  v.                                      Case No. 19-CV-1763

ANDREW M. SAUL,
**Commissioner of Social Security,**

    Defendant.

## DECISION AND ORDER

Kesha Lavelle Tate, who is representing herself, seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA") ceasing her entitlement to disability benefits as of October 22, 2015, under Section 223(f) of the Social Security Act. For the reasons below, the Commissioner's decision is affirmed.

## BACKGROUND

Tate was sexually assaulted by her supervisor at work in 2008 and was ultimately fired from her job. (Tr. 391.) After the assault, Tate reported that she lost her memory regarding the incident and began struggling with depression and severe anxiety and experiencing nightmares and flashbacks. (*Id.*) Tate began hearing a male voice commanding her to hurt herself and she attempted to cut her wrists; however, her mother intervened and she was admitted to the hospital in 2010 where she was started on Paxil[1] and Geodan.[2] (*Id.*) In a

---

[1] Paxil is used to treat depression, including major depressive disorder. https://www.drugs.com/paxil.html (last visited Dec. 2, 2020).
[2] Geodon is used to treat schizophrenia and the manic symptoms of bipolar disorder (manic depression). https://www.drugs.com/geodon.html (last visited Dec. 2, 2020).

decision dated March 9, 2010, Tate was found disabled beginning on February 5, 2009 due to amnesiac and anxiety disorders. (Tr. 11–12.) On October 15, 2015, however, it was determined that Tate was no longer disabled as of October 22, 2015 due to medical improvement. (Tr. 11.) This determination was upheld upon reconsideration after a disability hearing by a State agency Disability Hearing Officer. (*Id.*) Tate filed a request for a hearing and a hearing was held before an Administrative Law Judge ("ALJ") on August 30, 2018. (Tr. 30–59.) Tate testified at the hearing, as did Theresa Wolford, a vocational expert. (Tr. 30.)

In a written decision issued January 24, 2019, the ALJ found that the most recent favorable medical decision finding Tate disabled was March 9, 2010. (Tr. 13.) This is known as the "comparison point decision" ("CPD"). (*Id.*) The ALJ determined that at the time of Tate's CPD, she had the severe impairments of an amnesiac disorder and an anxiety disorder. (*Id.*) The ALJ found that Tate did not develop any additional impairments after the CPD; thus, she continued to have the same severe impairments. (*Id.*) The ALJ further found that Tate did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "listings"). (Tr. 13–15.) The ALJ determined that the medical evidence supported a finding that, by October 22, 2015, the medical severity of Tate's symptoms had decreased and that Tate had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, with the nonexertional limitation of having only occasional interaction with the public and co-workers. (Tr. 15–20.) The ALJ found that Tate's RFC since October 22, 2015 was less restrictive than her RFC at the time of her CPD and that since October 22, 2015, Tate was capable of performing her past relevant work as a laborer. (Tr. 20–21.) The ALJ alternatively

2

found that given Tate's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that she could perform. (Tr. 21.) As such, the ALJ found that Tate's disability ended on October 22, 2015 and that Tate has not become disabled again since that date. (Tr. 22.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Tate's request for review. (Tr. 1–5.)

## DISCUSSION

### 1. *Applicable Legal Standards*

#### 1.1 Medical Improvement

Once a claimant is determined to be under disability, her continued entitlement to benefits is periodically reviewed. 20 C.F.R. § 404.1594(a). A claimant who experiences medical improvement related to her ability to engage in work may lose her eligibility to receive benefits if there is an improvement in the claimant's condition:

> A recipient of benefits . . . may be determined not to be entitled to such benefits on the basis of a finding that the physical or mental impairment on the basis of which such benefits are provided has ceased, does not exist, or is not disabling only if such a finding is supported by--
>
> (1) substantial evidence which demonstrates that--
>
> (A) there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and
>
> (B) the individual is now able to engage in substantial gainful activity[.]

42 U.S.C. § 423(f). "Medical improvement" is "any decrease in the medical severity of impairment(s) present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled and is determined by a comparison of prior and current medical evidence which must show that there have been changes (improvement) in the

symptoms, signs or laboratory findings associated with that impairment(s)." 20 C.F.R. § 404.1594.

To determine if a claimant continues to be under disability, the regulations prescribe an eight-step sequential inquiry. *See* 20 C.F.R. § 404.1594(f). The evaluation process is intended to determine the following: (1) whether claimant is engaging in substantial gainful activity; (2) if not gainfully employed, whether the claimant has an impairment or combination of impairments which meets or equals a listing; (3) if impairments do not meet a listing, whether there has been medical improvement; (4) if there has been medical improvement, whether the improvement is related to the claimant's ability to do work; (5) if there is improvement related to claimant's ability to do work, whether an exception to medical improvement applies; (6) if medical improvement is related to the claimant's ability to do work or if one of the first groups of exceptions to medical improvement applies, whether the claimant has a severe impairment; (7) if the claimant has a severe impairment, whether the claimant has the RFC to perform past relevant work; and (8) if the claimant cannot perform past relevant work, whether the claimant can perform other work. *Id.*

### 1.2 Judicial Review

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions

4

drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

### 2. Application to this Case

Again, Tate was found disabled as of February 5, 2009, due to amnesiac and anxiety disorders stemming from a 2008 sexual assault. The SSA determined, however, that Tate experienced medical improvement and was no longer disabled as of October 22, 2015. Tate recounts the 2008 sexual assault and how it affected her life in the aftermath up until her suicide attempt and subsequent hospitalization in 2010. (Pl.'s Br. at 1–2, Docket # 12.) While Tate generally argues that the "whole situation had and still is really destroy[ing] and damag[ing her] mentally, physically, and emotionally," (*id.* at 1), Tate seemingly focuses on events from 2019 until the present, arguing that she was reevaluated by a new therapist and psychologist in 2019 and that she deals with daily anxiety and panic attacks, fear of being out in public and at home, flashbacks, and nightmares. (*Id.* at 3.) She argues that "every day, every minute, every hour," her parents have to "constantly keep close tabs on [her] to make sure nothing happen[s] to [her]" or that she does not hurt herself. (*Id.*) Tate argues that her

5

parents have to make sure she is able to do her day-to-day chores and care for her son. (*Id.*) Finally, Tate argues that she is "also dealing with the death of [her] step-father" and that her "emotions are all over the place." (*Id.*)

As an initial matter, the ALJ's decision is dated January 24, 2019. Thus, to the extent Tate sought re-evaluation, additional treatment, or experienced new symptoms from 2019 until the present (*see* Pl.'s Br. at 2–3), this information post-dates the ALJ's decision. Because the ALJ never had the opportunity to consider the evidence, it cannot serve as the basis for reversal pursuant to sentence four of 42 U.S.C. § 405(g). *See Eads v. Sec'y of Health & Human Servs.*, 983 F.2d 815, 817–18 (7th Cir. 1993). Likewise, it does not appear that Tate submitted medical records from 2019 to the Appeals Council (Tr. 4–5), nor has she requested a sentence-six remand, *see* § 405(g) (sixth sentence) (allowing federal court to remand a matter to the Commissioner "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.").

A review of the record before the ALJ, however, supports his finding that Tate medically improved as of October 22, 2015. As early as 2013, Tate's records indicated that her depression was in remission. (Tr. 328–30.) Tate was traveling out of state to visit family (Tr. 330), was working hard in school (*id.*), and was otherwise "psychiatrically, [ ] pretty stable" (Tr. 328). Similarly, in 2014, Tate's records note that she was "pleased with her progress" and stable on her medication. (Tr. 332.) During a perinatal psychiatry consultation in December 2014, Dr. Christina Wichman recounted Tate's psychiatric history following the 2008 assault and 2010 hospitalization, stating that after treating with Paxil and Geodan, Tate's "symptoms improved and she has been maintained on these medications for the past

6

4 years. She has not had any recurrence of depression or psychotic symptoms." (Tr. 391.) While Tate reported increased worry due to finances and the upcoming anniversary of her father's death, she denied having panic attacks, visual or audio hallucinations, or struggles with sleep. (*Id.*) Dr. Wichman noted Tate's depression was in full remission. (Tr. 393.)

Tate continued to treat with Dr. Wichman throughout 2015. From January through June 2015, Tate reported that she was happy (Tr. 395) and denied having panic attacks or hallucinations (Tr. 396, 400, 418). Dr. Wichman continued to note Tate's depression was in full remission with continued use of low dose sertraline[3] and Geodan. (Tr. 419–20.) In June, Tate requested an increase in Geodon secondary to worsening depressive symptoms; however by July, Tate reported to Dr. Wichman that her mind felt "eased," that she no longer felt distressed or overwhelmed, denied having panic attacks or hallucinations, and reported no struggles with sleep despite having a three month old baby at the time. (Tr. 431.) By October 2015, Tate reported to Dr. Wichman that she was doing well on her current regimen of medications, was thinking of re-enrolling in school, was doing well financially, and denied any panic attacks or hallucinations. (Tr. 600–01.) In fact, Dr. Wichman noted Tate showed no symptoms of depression and Tate denied any psychiatric complaints at that time. (Tr. 602.)

Tate began treating with Dr. Mi Y Nelson on March 1, 2016. (Tr. 625.) Tate informed Dr. Nelson that she "lost her disability" the previous month and with that, began experiencing an increase in depressive symptoms, feelings of worthlessness, hopelessness, and passive suicidal ideation. (Tr. 626.) Dr. Nelson stated that Tate was "relatively stable despite ongoing psychosocial stressors (relationships, family, medical, financial, vocational, and new baby)

---

[3] Sertraline (also called Zoloft) is used to treat depression, obsessive-compulsive disorder, anxiety disorders (including panic disorder and social anxiety disorder), post-traumatic stress disorder (PTSD), and premenstrual dysphoric disorder (PMDD). https://www.drugs.com/sertraline.html (last visited Dec. 2, 2020).

until she received bad news that she would lose her SSI." (Tr. 631.) Dr. Nelson noted that after Tate "refus[ed] psychotherapy on numerous occasions[,] she [was] now willing to engage in therapy to alleviate her symptoms." (*Id.*) In May, Tate reported to Dr. Nelson that things were "pretty good," that her depression was "much improved," and that she was excited to begin a cosmetology program. (Tr. 637.) She continued to report, however, low mood and hopelessness two to three times a week for half a day or so. (*Id.*) As a result, Dr. Nelson increased Tate's Zoloft prescription. (*Id.*) In June, Tate reported to Dr. Nelson that she was tolerating the increase in Zoloft well, only felt sad "once in a blue moon," and was planning her wedding for June 2018. (Tr. 642–44.)

In July 2016, Tate established treatment with Dr. James Ruvalcaba. (Tr. 645.) Tate reported that since her assault, she had become hypervigilant and experienced chronic anxiety. (Tr. 646.) She reported to Dr. Ruvalcaba that she had occasional flashbacks and nightmares, which were gradually improving. (*Id.*) In August, Dr. Ruvalcaba noted Tate's mood was good and her anxiety had decreased. (Tr. 653–54.) Tate was looking forward to starting school to become a hairdresser, was optimistic and goal-directed, and found great satisfaction caring for her son. (Tr. 654.)

On January 19, 2017, Tate presented to the emergency room after nearly fainting at school. (Tr. 844.) Tate reported that she was under a significant amount of stress and had missed her last appointment with her therapist. (Tr. 848.) The next day, Tate treated with Sarah Shortts, APNP, and requested a "doctor's excuse" to "take a break from school" for the next three months due to feeling overwhelmed. (Tr. 854.) While Tate denied depression, she reported anxiety about school and her physical health. (*Id.*) However, she stated that she had good support from her family and friends. (*Id.*) Shortts stated that she "[did] not feel

8

Case 2:19-cv-01763-NJ   Filed 12/02/20   Page 8 of 11   Document 14

comfortable writing a note to excuse her from school for more than today." (*Id.*) Throughout early 2017, despite experiencing anxiety related to life stressors (Tr. 892, 926), Tate reported a general decrease in anxiety (Tr. 913) to a manageable level (Tr. 895). Tate was "optimistic, future-orientated, and eager to re-start cosmetology school in early March." (Tr. 910–11.)

By May 2017, Tate reported to Dr. Ruvalcaba that she had to withdraw from cosmetology school, was struggling financially, was having difficulty sleeping due to anxiety, and felt "overwhelmed" and "down." (Tr. 935.) Despite her increased anxiety and "down" mood, however, Dr. Ruvalcaba found that Tate did not meet the criteria for having a major depressive episode. Her sertraline was again increased. (Tr. 938.)

At the same time, Tate established care with therapist Beverly Duncan, whom she treated with from May 2017 until February 2018, when she was discharged for non-attendance. (Tr. 1157, 1161–64, 1191.) During this treatment period, Tate generally reported to Duncan that she was having difficulty with her day-to-day functioning due to her distressed mood. (*Id.*) On October 17, 2017, Tate established a treatment relationship with Dr. Mary-Anne Kowol. (Tr. 994.) Dr. Kowol noted that "[a]t this point," Tate "still gets panic attacks if somebody says something that reminds her [of the assault]." (Tr. 995.) Tate reported having one panic attack per week lasting about 10-15 minutes and having nightmares every 4-8 weeks. (*Id.*) Tate reported to Dr. Kowol that she dropped out of school because she was running out of classes due to panic attacks and that she had a hard time being around other people. (*Id.*) Tate denied being "overly depressed," but said she was easily stressed. (*Id.*) Dr. Kowol observed that Tate seemed "more impaired than she initially comes across, given the school drop-out." (Tr. 998.) Finally, the records indicate Tate began treating with a new

9

therapist in May 2018 and treated until July 2018, where Tate continued to report panic attacks, depressed mood, and anxiety. (Tr. 1229–60.)

During the August 2018 hearing, when asked by the ALJ what would prevent her from performing simple work, at a desk, where she only occasionally had to interact with anyone, Tate responded "nothing really" and confirmed that she only had problems when she was around a lot of people. (Tr. 53–54.)

As recounted above, the medical records support the ALJ's finding of medical improvement as of October 22, 2015. In fact, from 2013, until Tate learned she was losing her disability benefits in early 2016, Tate's mental health was stable on medication and she was doing very well. Even after experiencing an emotional set-back with the loss of her disability benefits and despite having stress and anxiety related to her physical health, Tate generally reported doing very well on her medications at that time.

Tate's therapy records from mid-2017 until mid-2018 do indicate an increase in anxiety and panic attacks. While the ALJ acknowledges this (Tr. 18), he paints the records in a slightly less than accurate light. For example, the ALJ glosses over Duncan's notes that Tate's day-to-day functioning was difficult and found it "notable" that Tate cancelled some of her more recent therapy appointments in late 2018, implying that she did not need treatment. (*Id.*) In actuality, her therapist cancelled one of the appointments due to a scheduling conflict (Tr. 1248) and Tate cancelled one to take her father to the hospital (Tr. 1247). These errors, however, do not undermine the ALJ's conclusion of medical improvement. During the same time Tate's therapy records indicated difficulty being around people and experiencing panic attacks, she reported to her physician that she had an upcoming trip to Las Vegas with her friends and was nervous about flying. (Tr. 985.) She did not report, however, anxiety about

the prospect of being around other people. Further, during this time, she denied to her physician having sleep problems or a depressed mood and stated she was tolerating the sertraline well. (Tr. 964.) Most tellingly, Tate herself testified that she only experiences difficulties when she is around a lot of people and that "nothing really" keeps her from performing simple work, at a desk, where she only occasionally has to interact with anyone. The ALJ accommodated Tate's stated difficulty interacting with people in her RFC. Tate does not otherwise articulate how the ALJ erred in his findings. For these reasons, the ALJ's decision is affirmed.

## CONCLUSION

The ALJ's decision that Tate's disability ended on October 22, 2015 is supported by substantial evidence. Thus, the Commissioner's decision is affirmed and the case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **AFFIRMED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 2nd day of December, 2020.

BY THE COURT

*Nancy Joseph*

NANCY JOSEPH
United States Magistrate Judge